IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANET KOTASKA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-9321 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Janet Kotaska brings suit against her former employer, Defendant Federal Express Corporation, for allegedly discriminating against her on the basis of her age, gender, and disability, and retaliating against her based on her disability discrimination complaints and her filing of a worker's compensation claim, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII, 42 U.S.C. § 2000e; and state law. Currently before the Court is Defendant's motion for summary judgment [22] and Plaintiff's motion to strike [35]. For the following reasons, Defendant's motion [22] for summary judgment is granted, and Plaintiff's motion [35] to strike is denied. The Court will issue final judgment and close the case.

**I.    Background**

Defendant Federal Express Corporation ("Defendant") is an express transportation and delivery company. Plaintiff Janet Kotaska ("Plaintiff"), a female currently in her sixties, worked for Defendant as a courier and handler from 1998 to 2013 at Defendant's Cary, Illinois station (the "UGN Station"). Plaintiff also worked for Defendant as a handler at the UGN Station for approximately three weeks in April 2015 before she was involuntarily placed on a personal

medical leave of absence by Defendant. Defendant contends that Plaintiff was placed on this leave of absence because she had certain permanent restrictions on her lifting abilities at the time that rendered her unable to perform essential functions of the handler position. Specifically, Plaintiff's permanent restrictions in 2015 limited her lifting ability as follows: "[F]requent lifting of 75 pounds from the floor to waist, 15 pounds frequently from the waist to shoulder and 30 pounds on occasional basis. She should limit overhead use to only limited frequency and only up to 5 pounds. She could lift up to 15 pounds overhead with left hand assist." [28, Ex. 17 to Ex. A.] The written job description for the handler position requires the ability to lift 75 pounds. [28, Ex. 14 to Ex. A.]

Plaintiff's employment with Defendant was terminated at the end of her 90-day leave period in July 2015, when Plaintiff had not obtained another position with the company before her leave period expired. Plaintiff thereafter filed this complaint against Defendant for disability, age, and gender discrimination, and for retaliation, based on Defendant's actions in 2015 surrounding these events.

## A.     Plaintiff's Motion to Strike

Plaintiff moves to strike an argument in Defendant's reply brief, and certain of Defendant's objections to Plaintiff's Local Rule 56.1 statement that rely on this argument, because she contends that Defendant waived this argument by not including it in its opening summary judgment brief. [See 35.] Because of the shaping role of Local Rule 56.1 fact statements in resolving motions for summary judgment, the Court will first address Plaintiff's motion to strike.

After briefing on Defendant's summary judgment motion was completed, Plaintiff filed her motion to strike. In this motion, Plaintiff claims that Defendant's reply brief argues for the first time that its alleged policy that handlers must be able to lift 75 pounds *over the waist and*

*overhead* was immaterial to Plaintiff's termination in 2015. [35, at 1–2.] According to Plaintiff, the requirement that handlers be able to lift 75 pounds is limited to lifting 75 pounds *from floor to waist*, which she could do, and there is no requirement that handlers be able to lift packages weighing 75 pounds above their waists. Plaintiff argues that Defendant's statement in its reply that whether or not such a policy exists is immaterial to the summary judgment motion "is a newly stated argument to which Plaintiff never had an opportunity to respond" because Plaintiff has been proceeding in her opposition by arguing that she was fired as a result of this alleged policy. Therefore, Plaintiff argues, she will be prejudiced if the Court considers the argument itself and any of Defendant's Local Rule 56.1 statement objections that rely on this argument. [*Id.*, at 2.]

Plaintiff's motion to strike is denied. Defendant's opening brief very clearly argues that Plaintiff's entire suite of physician-imposed lifting restrictions, including her restrictions on lifting certain weights from her waist to her shoulder and overhead, are material to the issues in this case, including Plaintiff's ability to perform the essential functions of the handler position and the decision to remove Plaintiff from that position in April 2015. See, *e.g.*, [22-1, at 1, 5] (discussing Plaintiff's over-the-waist and overhead lifting restrictions). Defendant also addressed this issue regarding the overhead lifting requirements of the handler position in its Local Rule 56.1 statement, and Plaintiff took the opportunity to address it in her response to this statement. See [22-3, ¶ 52] ("The CHCMP committee considered not only Kotaska's inability to lift 75 pounds above her waist, but their decision was also based on her inability to lift more than 15 pounds frequently above her waist and her overhead lifting restriction."); [28-1, ¶ 52] ("Admit that this was Ramos' testimony in her deposition. Deny that the CHCMP committee considered any restrictions other than Plaintiff's restriction on lifting 75 pounds over her waist and overhead."); see also [22-3, ¶¶ 24–36] (Defendant's statements of fact regarding the essential functions of the

handler position, including requirements to lift packages over the waist and overhead as parts of those functions). The Court will further address the actual merits of Defendant's argument below, but for purposes of Plaintiff's motion, the Court discerns no basis to strike any of Defendant's arguments because of waiver. Defendant's main argument on summary judgment is that Plaintiff cannot perform the essential functions of the handler position because of her lifting restrictions: Plaintiff had the opportunity to respond to this argument and did so. [See 28, at 11–15.] Plaintiff's focus on specific aspects of her own lifting restrictions and the essential functions of the handler position over other aspects of these two issues in her opposition does not mean that Defendant "implicitly assert[ed]" something new in its reply by re-emphasizing its main argument. Therefore, Plaintiff's motion to strike [35] is denied.

### B. Factual Background

The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: (1) Defendant's Local Rule 56.1 Statement of Undisputed Material Facts [22-3], (2) Plaintiff's Response to Defendant's Statement of Undisputed Material Facts [28-1], (3) Plaintiff's Statement of Undisputed Material Facts [28-2], and (4) Defendant's Response to Plaintiff's Additional Statement of Undisputed Material Facts [34-1]. The facts are undisputed, except where a dispute is noted, taking into account the objections that both parties have made in their responses. The Court views the record in the light most favorable to the nonmoving party—here, Plaintiff—and construes all facts in her favor. *Ellis v. DHL Express, Inc.*, 633 F.3d 522, 525 (7th Cir. 2011).

### 1. Defendant's Employment-Related Policies

Two sets of policies maintained by Defendant are relevant to Plaintiff's claims: Defendant's disability accommodation request policy and Defendant's medical leave of absence

policy.  Plaintiff received a copy of and had access to all of Defendant's employment-related policies while working for the company.  [22-3, ¶ 8.]

Defendant's Human Capital Management Program ("HCMP") department manages employee absence programs and requests for disability-related accommodations.  [*Id.*, ¶ 4.]  The process for requesting disability accommodations involves multiple steps.  First, the employee is typically asked to complete an accommodation request form describing the accommodation needed.  Second, a local HCMP committee consisting of the employee's HCMP Advisor, the employee's Human Resources Advisor, a safety representative, and a management representative meet to discuss whether the employee can be accommodated in his or her current position.  The local committee then makes a recommendation that is sent to the Corporate HCMP Committee.  The Corporate HCMP Committee makes the final decision as to whether or not an accommodation can be made for an employee.  [*Id.*, ¶ 5.]

Defendant also maintains a Medical Leave of Absence policy that provides employees who have less than 90 days of continuous service with a maximum leave duration of 90 calendar days.  [*Id.*, ¶ 6.]  This policy also provides that when an employee is released to return from this leave period, but is unable to perform the essential functions of his or her position with or without a reasonable accommodation at that time, the employee may submit unlimited job change applications for 90 calendar days and will receive preferential placement for lateral or lower level positions which he or she is qualified to perform with or without an accommodation.  If no position is offered and accepted after 90 days, the employee is terminated in accordance with this medical leave policy.  [*Id.*, ¶ 7.]

### 2.    Plaintiff's First Period of Employment by Defendant

Plaintiff worked for Defendant from 1998 to 2013 at the UGN Station, first as a courier handler and then as a courier. In 2011, Plaintiff suffered an on-the-job injury to her shoulder for which she sought and received worker's compensation benefits. Plaintiff made no other claim for worker's compensation benefits while employed by Defendant. [22-3, ¶¶ 9–12.]

Following this injury, in March 2013, Plaintiff's treating physician imposed permanent restrictions on her lifting abilities. Specifically, Plaintiff was limited to frequent lifting of 25 pounds from floor to waist, with occasional lifting of up to 60 pounds from floor to waist; 15 pounds frequently from waist to shoulder, with lifting 30 pounds from waist to shoulder on an occasional basis; and frequent lifting of up to 5 pounds overhead, with occasional lifting of up to 15 pounds overhead with left hand assist. [*Id.*, ¶ 13.] Plaintiff informed Defendant of these restrictions on her lifting abilities. [*Id.*]

The courier position that Plaintiff held at that time required the ability to lift 75 pounds unassisted and, with these permanent lifting restrictions, Plaintiff did not meet that requirement. [*Id.*, ¶ 14.] Plaintiff thereafter went on medical leave and had 90 days to secure another position with Defendant that she could perform either with or without a reasonable accommodation, pursuant to Defendant's policy. [*Id.*, ¶ 15; 28, Ex. 2 to Ex. A.] Plaintiff applied for a handler position at the UGN Station during this period and requested an accommodation that she only lift freight within her weight restrictions. On August 14, 2013, Jennifer Ramos ("Ramos"), a senior HCMP Manager, sent Plaintiff a letter denying Plaintiff's request because her lifting restrictions could not be accommodated in that position: "The Handler position at this location is physically demanding and requires repetitive lifting of weight up to 75 lbs. unassisted. Therefore, per management, the station is unable to accommodate your request." [28, Ex. 6 to Ex. A.] In accordance with Defendant's medical leave of absence policy, Plaintiff was terminated by

Defendant on August 16, 2013 after she failed to secure another position that she could perform with or without a reasonable accommodation, given these lifting restrictions. [22-3, ¶ 15.]

Plaintiff contends that she complained about disability discrimination after her 2013 termination by (1) using Defendant's internal appeals process known as the "GFT" process, (2) speaking to Ramos and HCMP Advisor Todd Bell, and (3) sending a letter to someone at Defendant, although Plaintiff cannot recall the name of the person to whom she sent the letter. [22-3, ¶¶ 68, 70.] Defendant has an internal EEO complaint procedure for employees to use in reporting allegations of discrimination to management, and this procedure is available in Defendant's employee handbook and on Defendant's intranet. [*Id.*, ¶¶ 2–3.] Plaintiff did not utilize this internal EEO complaint procedure at any time to make a discrimination complaint, however. [*Id.*, ¶ 72.]

### 3. Plaintiff's New Lifting Restrictions and Re-Hire in 2015

After Plaintiff's first period of employment with Defendant ended in her termination, Plaintiff continued to apply for jobs both with Defendant and with other companies. [28-2, ¶ 1.] In 2014, Plaintiff's physician updated her permanent lifting restrictions. These new restrictions read:

> With regards to work, she is cleared for light duty activity. I believe that we could, in fact, increase some of her weight restrictions. At this point permanent restrictions would include frequent lifting of 75 pounds from the floor to waist, 15 pounds frequently from the waist to shoulder and 30 pounds on occasional basis. She should limit overhead use to only limited frequency and only up to 5 pounds. She could lift up to 15 pounds overhead with left hand assist.

[28, Ex. 17 to Ex. A.]

In March 2015, Plaintiff was re-hired as a handler at the UGN Station by Jennifer Charles ("Charles"). Charles was the operations manager at the UGN Station and Plaintiff's former supervisor, and she knew Plaintiff to be a good employee. Charles was also aware of Plaintiff's

previous lifting restrictions from 2013. [28-2, ¶ 4; 22, Ex. F, ¶ 2.] Plaintiff was re-hired after she originally filled out an application for a UGN Station courier position, and Charles subsequently contacted her about a handler position at that station. [22-3, ¶¶ 4, 16; 28, Ex. A, 82:20-84:3; 28-2, ¶ 3.]

Plaintiff and Charles met in March 2015. [34-1, ¶ 5; 28, Ex. 1 to Ex. C.] At this meeting, Charles urged Plaintiff to take the job as a handler at the UGN Station. [22-3, ¶ 23; 28-2, ¶ 5.] Plaintiff testified that this meeting was "off the books," according to Charles. [28, Ex. A, 98:13–19.] Plaintiff does not specify what "off the books" means in this context. Plaintiff did receive an offer letter from Charles on Defendant's letterhead, indicating that Plaintiff was offered and accepted the position of "Part-Time Handler (Non-DOT) PT SPLIT SHIFT" at the UGN Station on March 11, 2015. [28, Ex. 1 to Ex. C.] The offer letter notes that the job offer is "contingent upon successful completion of the FedEx Express hiring process." [*Id.*]

As part of this hiring process, Plaintiff completed a handler application. [28, Ex. 13 to Ex. A.] This application included the following question: "This job requires repetitive lifting and lowering of packages that may weigh up to 75 pounds in a fast-paced environment. To perform the job, you must be able to bend, stoop, stand and walk to sort, load and unload packages in an efficient manner. Can you perform these tasks with or without reasonable accommodation?" [*Id.*] Plaintiff answered yes and asserts that this answer was truthful, given her revised lifting restrictions that allowed her to lift 75 pounds up to her waist.[1] [28-1, ¶ 18.]

---

[1] At her deposition, Plaintiff acknowledged filling out this handler application. In her Local Rule 56.1 statement, however, Plaintiff notes that this application does not contain her signature and argues that it is not legally binding. [28-2, ¶ 6.] Defendant disputes this by pointing to evidence that Plaintiff at her deposition also acknowledged signing the contract. [34-1, ¶ 6.] The Court need not consider this disputed issue because it is ultimately immaterial to resolution of Defendant's summary judgment motion, but the Court does note that Plaintiff specifically admits that she filled out an application for a handler position that contained this question and she responded to it by answering "Yes." [28-1, ¶ 18.]

As a result of this hiring process, Charles hired Plaintiff as a part-time "split-shift" handler at the UGN Station effective April 5, 2015, with a start date of April 6, 2015. [28, Ex. 1 to Ex. C.] As a "split shift" worker, Plaintiff worked a couple of hours in the morning and then returned to work a couple of hours in the evening. [22-3, ¶¶ 21–22.]

### 4.    The Requirements of the Handler Position

The primary job of a handler at the UGN Station is to lift and move packages. [22-3, ¶ 24.] According to the written description of this position, an essential duty of the handler is to "load/unload aircraft containers and company vehicles in a safe and efficient manner." [28, Ex. 14 to Ex. A.] This responsibility varies slightly between the morning and the evening parts of a handler's split shift. In the morning, the handler is responsible for unloading packages from large metal containers referred to variously as AMJs, ULDs, or cans. These cans can be eight feet tall and eight feet deep and may contain packages stacked as high as 7.5 or 8 feet. In the evening, the handler is responsible for unloading any packages picked up by couriers during the day from couriers' vehicles and loading those packages back into the cans for transport to the airport. [22-3, ¶¶ 25–27.] These courier vehicles can have up to three shelves running along the interior of each side, with the top shelf sitting roughly 4.5 feet above the floor of the vehicle. [*Id.*, ¶ 28.] Plaintiff was the only handler employed at the UGN Station in April 2015 to perform this loading/unloading function, although Plaintiff notes that couriers load their own trucks during the morning shift and may assist handlers during the evening shift as necessary. [*Id.*, ¶ 36; 28-1, ¶ 36.]

The written description of the handler position describes the lifting requirements for this position as follows: "Able to lift 75 lbs. Able to maneuver packages of any weight above 75 lbs. with appropriate equipment and/or assistance from another person." [22-3, ¶ 31; 28, Ex. 14 to Ex. A.] This written description does not further explain the 75-pound lifting requirement. According

to Plaintiff, however, in practice this requirement for handlers is limited to the ability to lift 75 pounds from floor to waist. [28-2, ¶¶ 12–13a.] Plaintiff testified that she was told by Charles that this was the case. [28, Ex. A, 101:1–102:7.] Other employees also testified that a handler at the UGN Station would not need to be able to lift a 75-pound package over her head. Phil Hutchinson ("Hutchinson") and Laurie Mroz ("Mroz"), both couriers and former handlers at the UGN Station, testified that they had never heard of such a requirement. [28, Ex. G, 30:17–31:5; 28, Ex. B, 17:2–7.]

Handlers at the UGN Station do have to lift packages over their waists and overhead as part of their loading and unloading duties, however. These handlers must unload approximately 1,000 packages per hour in the morning and load between 400–500 packages per hour in the evenings. [22-3, ¶ 35.] Handlers must unload and load these packages at a fast pace in the morning because there is only a limited amount of time between when the cans arrive at the station and when the delivery vehicles must leave to meet Defendant's delivery commitments to its customers. [*Id.*, ¶ 34.] Mroz, who has worked as a handler and a courier for a total of 27 years, estimated in her deposition that handlers have 50 minutes to unload packages in the morning. [28, Ex. B, 36:6–7.] Similarly, there is only a limited amount of time in the evenings for handlers to reload the cans before the trailers carrying the cans must leave to deliver packages to the airport. [22-3, ¶ 34.] The average weight of packages traveling through the UGN Station in 2015 was approximately 15 pounds, but there is no way to predict the size or shape of the packages that need to be moved within the UGN station each day as that station accepts packages weighing up to 150 pounds. [*Id.*, ¶¶ 32–33.]

According to Defendant, given the height of the cans and the height of the shelves in couriers' vehicles, these fast-paced loading and unloading tasks require handlers to frequently lift

and maneuver packages above their waist and overhead. [22-3, ¶ 30.] Peter Brush ("Brush"), a senior manager who worked for Defendant in 2015, testified at his deposition that a handler of Plaintiff's height[2] would need to lift packages (1) above her waist 50 percent of the time to load or unload cans, (2) above her waist 33 percent of the time to load or unload trucks, and (3) above her head 20 to 33 percent of the time when loading or unloading trucks. [28, Ex. D, 106:5–107:10.] Mroz testified that when unloading cans, she would have to reach overhead to reach packages weighing 5 or 15 pounds on a daily basis. [28, Ex. B, 42:22–46:12.] Mroz also testified that when unloading cans with poorly stacked packages, the packages would sometimes fall so that she would not have to reach up to unload them; or, if packages were stacked well, handlers could pull them out from shoulder level without having to reach overhead. [28, Ex. B, 47:1–14.] In her deposition, Plaintiff agreed that as a handler she "would have to be able to lift above [her] head to unload some of those trucks" and that she was required to lift some packages from her waist to her shoulder as a handler. [28, Ex. A, 102:9-21, 105:16-106:10.] Plaintiff also testified that as a handler she did "[n]ot normally" have to lift packages over her head or to her shoulder level. [*Id.*, 36:1–7.]

Plaintiff testified that, at her meeting with Charles in March 2015 before she was re-hired as a handler, Charles made certain representations about what Plaintiff's specific position as a handler would look like. Specifically, Plaintiff testified that Charles told her that she would only be working in the handler position for three weeks, after which Charles would get Plaintiff into a courier position that Plaintiff truly wanted and had originally applied for. [28-2, ¶ 5; 28, Ex. A, 84:7–19.] Plaintiff also testified, however, that couriers have the same lifting requirements as handlers. [28, Ex. A, 134:11–19.] Plaintiff further testified that Charles told her that she would only have to offload trucks as part of her duties as a handler at the UGN Station. [28-2, ¶ 5; 28,

---

[2] Plaintiff is five feet two inches tall. [22-3, ¶ 29.]

Ex. A, 99:17–24.] Charles denies telling Plaintiff that she would only have to work as a handler for three weeks. [34-1, ¶ 5; 22, Ex. H, 74:16–75:10.]

### 5. Plaintiff's Employment as a Handler at the UGN Station in April 2015

Plaintiff began work as a handler at the UGN Station on April 6, 2015, and she continued in this position until she was placed on medical leave on April 24, 2015. During this period of employment, Plaintiff was not given any accommodation for her lifting restrictions. [28 (Kotaska Decl.), ¶ 4.] Plaintiff also did not complain about being in pain or about being unable to handle her workload in those three weeks. [28-2, ¶ 15.] Other employees at the UGN Station testified that Plaintiff did not appear to have any trouble with her work as a handler, including Charles, Brush, Hutchinson, and Mroz. [*Id.*, ¶¶ 19–22.] Ramos similarly heard no complaints about Plaintiff's performance during that three-week period. [*Id.*, ¶ 7.] One courier, Jerrie Hanus Harvey, did testify about an incident when Plaintiff had issues with lifting packages. Specifically, Harvey testified that while she worked with Plaintiff, Plaintiff refused to assist her with a large package because Plaintiff "couldn't pick it up." [28, Ex. H, 16:10–23.] Harvey testified that she reported this incident to Charles. [*Id.*, 21:8–11.] Charles testified about this conversation as well, indicating that she reported it to her manager, Brush. [28, Ex. C, 123:18–124:19.] However, Plaintiff denies that she ever complained about being in pain or about lifting while she worked as a handler in 2015. [28-2, ¶ 15.]

Within a week of Plaintiff's start date, Bruce Wibright ("Wibright"), a Human Resources Advisor, visited the UGN Station and learned that Plaintiff had been re-hired. [22-3, ¶ 37.] Wibright knew Plaintiff from her previous period of employment and was therefore aware of her 2013 lifting restrictions. Wibright advised Bradley Fowler ("Fowler"), Plaintiff's HCMP Advisor, of Plaintiff's re-hire and her previous lifting restrictions from 2013. [*Id.*, ¶ 38.]

On April 13, 2015, after speaking to Wibright, Fowler sent an e-mail to Charles and Brush regarding Plaintiff. [28, Ex. 1 to Ex. F.] Fowler noted that Plaintiff had been terminated in 2013 with a conditional status for rehire and described her 2013 lifting restrictions. [28-2, ¶¶ 25–26.] He questioned whether any new medical documentation had been provided for Plaintiff's re-hire and advised Plaintiff's management group to temporarily accommodate Plaintiff within her 2013 lifting restrictions while they investigated any updates to her permanent restrictions as of April 2015. [22-3, ¶ 39; 28-2, ¶ 10.]

On April 20, 2015, Fowler prepared a written memo to Plaintiff requesting that she provide current medical documentation addressing the status of her lifting restrictions. [22-3, ¶ 40; 28, Ex. 7 to Ex. F.] In the letter, Fowler described Plaintiff's 2013 lifting restrictions and noted the handler position's requirement to be able to lift 75 pounds "unassisted." [28-2, ¶ 27; 28, Ex. 7 to Ex. F.] The letter also states that Plaintiff notified management that she was having difficulty performing the lifting requirements of the position. [28, Ex. 7 to Ex. F.] However, in a phone call with Fowler the next day, Plaintiff denied that she notified management of any pain or lifting issues. [28-2, ¶¶ 27–28.] During that phone call, Plaintiff also stated that she had been medically cleared to lift 75 pounds from floor to waist, and Fowler asked for supporting documentation. [22-3, ¶ 41; 28-2, ¶ 28; 28, Ex. J.] Plaintiff then provided a doctor's note dated February 12, 2014 that listed her revised lifting restrictions. [22-3, ¶ 42.] The exact date on which Plaintiff provided this doctor's note to Fowler is unclear from the record, although on April 22, 2015, Brush wrote an e-mail to Fowler with the subject line "Update: Jennifer [sic] Kotaska #331812 UGNA." [28, Ex. K.] The e-mail stated: "I'm guessing that there are only 2 outcomes?  1. She is released to full duty[.]  2. She is terminated for not disclosing her physical limitations during the application process[.]"  [*Id.*]

On April 23, 2015, Fowler wrote an e-mail to Brush notifying him that Plaintiff would be placed on a personal leave of absence effective April 24. Fowler also requested that Brush provide him with an assessment of the handler position and Plaintiff's "ability to perform this job in regard to her responsibilities, job duties, expectations, and any other pertinent information." [28-2, ¶ 30; 28, Ex. 27 to Ex. D.]

On that same date, Fowler sent Plaintiff a letter notifying her that she was being placed on medical leave:

> A review of your medical status indicates you have reached maximum medical improvement and have been released to return to work with permanent restrictions of frequent lifting of 75 pounds from floor to waist, 15 pounds frequently from the waist to should[er] and 30 pounds on occasional basis. She should limit overhead use to only limited frequency and only up to 5 pounds. She could lift up to 15 pounds overhead with left hand assist. These restrictions limit your ability to perform the essential functions of your position at 60013/UGNA/IL/0000 as a Handler (Non-DOT). Please contact me if you wish to request an accommodation for your current position.

[28, Ex. 18 to Ex. A.] This letter also advised Plaintiff that she had 90 days in which to seek a new position at the company for which she met the minimum qualifications and could perform either with or without an accommodation in the event she could not be accommodated in her current position. [*Id.*] Before being placed on leave in this manner, Plaintiff did not know of any concerns about her working in the handler position at the UGN Station. [28 (Kotaska Decl.), ¶ 8.] Plaintiff did not initiate or request this leave of absence. [28-1, ¶ 7.]

On April 24, 2015, Brush responded to Fowler's e-mail with his assessment of the handler position and Plaintiff's ability to work in that position considering her lifting restrictions. Brush stated that "it is not possible for someone with the noted physical restrictions to perform the PT Handler duties at our [UGN Station]. A basic job function is to load AMJ containers, which are

up to 8' in height. A PT Handler needs to be able to lift 75 lbs. unassisted over their waist in order to properly and safely build t-stacked walls." [28, Ex. 32 to Ex. D.]

### 6. Plaintiff's Leave of Absence and Termination

While on leave of absence, Plaintiff did not complete and return an accommodation request form to Defendant. [22-3, ¶ 45.] According to Plaintiff, she was never given an accommodation form to fill out. [34-1, ¶ 9.] Plaintiff also testified that she could not recall whether she requested an accommodation for her lifting restrictions in 2015. [28-1, ¶ 65.] Nevertheless, Defendant evaluated whether Plaintiff's lifting restrictions could be accommodated in the handler position. [22-3, ¶ 46.]

On April 30, 2015, following Defendant's accommodation request procedure, the local HCMP Committee consisting of Fowler, Wibright, Safety Specialist Brian Molenda and Senior Manager Tom Hucher considered whether Plaintiff's lifting restrictions could be accommodated in the handler position. [22-3, ¶ 47.] Brush's assessment of the Handler position was reviewed by the local HCMP committee. [28, Ex. 19 to Ex. F.] The local HCMP committee recommended that Plaintiff "not be permitted to work as a Handler due to her permanent restrictions and limitations" and that she remain on a 90-day leave of absence so that she could look for another position. [22-3, ¶ 49.]

The Corporate Human Capital Management ("CHCM") Committee then met on May 4, 2015 to determine whether Plaintiff's permanent restrictions could be accommodated in the position of Handler at the UGN Station. [28, Ex. 5 to Ex. E.] In a May 12, 2015 letter to Plaintiff, Ramos (who had previously denied Plaintiff's 2013 accommodation request) advised Plaintiff that the CHCM Committee had determined that her restrictions could not be accommodated in the handler position:

One of the basic job functions of this position is to load AMJ containers, which are up to 8' in height. Lifting packages over the waist and overhead for weights up to 75 lbs. unassisted is required in order to properly and safely build T-stacked walls. You are also required to load ULDs, which requires lifting up to than [sic] 75 lbs. above the waist and overhead. Your restrictions prevent you from being able to load ULDs.

After careful review, the CHCMC denied an accommodation to waive job requirements associated with the Handler position at the UGN location. Your restrictions prevent your ability to perform the essential functions of this position.

[28, Ex. 5 to Ex. E.]

At her deposition, Ramos testified that in addition to considering Plaintiff's inability to lift 75 pounds above her waist, the CHCM Committee also considered Plaintiff's inability to lift more than 15 pounds frequently above her waist and her overhead lifting restriction in assessing whether her restrictions could be accommodated in the handler position. [22-3, ¶ 52.] Plaintiff disputes that the CHCM Committee actually considered any of Plaintiff's restrictions other than the restriction on lifting 75 pounds over her waist. [28-1, ¶ 52; 28, Ex. 5 to Ex. E.]

While Plaintiff was on leave of absence, she was entitled to apply for other positions within the company and receive preferential placement for lateral or lower level positions for which she was qualified. During her 90-day leave period, Plaintiff applied for three other positions with Defendant using Defendant's job application system for internal applicants. [22-3, ¶¶ 54–55.] All of these positions were courier positions. Fowler also provided Plaintiff with information regarding Defendant's typing test that could open up the types of jobs that Plaintiff could apply for, but there is no evidence that Plaintiff ever took the test or applied for other types of jobs. [22-3, ¶ 53.]

Plaintiff first applied for a full-time courier/swing driver position under Charles at the UGN Station. [*Id.*, ¶ 56.] Plaintiff did not receive placement preference for this position because moving from a handler position to a courier position is considered a promotion. [*Id.*, ¶ 58.] Plaintiff was

not the successful candidate for this position. According to Defendant, this was based on the fact that she had a lower "CEV" score than other candidates for the position (an objective system that assigns employees credit based on months of continuous employment with the company), and because she did not receive placement preference for the position. [*Id.*, ¶ 57.] Plaintiff, however, was told by Fowler told her that she would not get any position that she applied for because there was a "red flag" on her. [28-1, ¶ 57.] The position was awarded to Jennifer Orr, a 42-year-old female. [22-3, ¶ 59.]

Plaintiff then applied for a second courier position at the UGN Station. Plaintiff was not successful in obtaining this courier position. According to Defendant, Plaintiff withdrew herself from consideration for this position. [22-3, ¶ 60.] Plaintiff disputes this and states that she never withdrew any application for a position that she sought with Defendant. [28 (Kotaska Decl.), ¶ 6.]

Finally, Plaintiff applied for a courier position at Defendant's Waukegan, Illinois station. [22-3, ¶ 61.] Plaintiff was not the successful candidate for this position, and it was awarded to Traci Lloyd, a 44-year-old female. [22-3, ¶¶ 61–63.] Defendant states that she was unsuccessful because she had a lower CEV score than other applicants and because she did not receive preferential placement for the position. [22-3, ¶ 62.] Plaintiff again disputes this by pointing to Fowler's comment that she had a "red flag" that prevented her from getting other positions with the company. [28-1, ¶ 62.]

On July 23, 2015, after Plaintiff exhausted her available leave time and failed to secure a position she could perform the essential functions of, either with or without an accommodation, Plaintiff's employment with Defendant was terminated. [22-3, ¶ 64.]

C.    **Procedural History**

Plaintiff filed her complaint against Defendant in September 2016. [See 1.] In her complaint, Plaintiff brings claims against Defendant for discrimination on the basis of age in violation of the ADEA (Count I); discrimination on the basis of gender in violation of Title VII (Count II); discrimination and retaliation in violation of the ADA (Count III); and retaliatory termination in violation of state law (Count IV). [*Id.*] Defendant has moved for summary judgment on all of Plaintiff's claims. [See 22.]

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099,

1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

III.     **Analysis**

A.       **Age and Gender Discrimination Claims (Counts I and II)**

In Counts I and II of her complaint, Plaintiff brings claims for age and gender discrimination in violation of the ADEA and Title VII. [See 1, ¶¶ 24–32.] Defendant moves for summary judgment on both counts, arguing that Plaintiff cannot establish a *prima facie* case of either age or gender discrimination. [See 22-1, at 10–11.]

To prove discrimination under either Title VII or the ADEA, a plaintiff must establish that she suffered an adverse employment action that was motivated by discriminatory animus. See *Carson v. Lake Cty., Ind.*, 865 F.3d 526, 532 (7th Cir. 2017) ("A plaintiff seeking to recover for disparate treatment under the ADEA must 'prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action.'") (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009); *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 603

(7th Cir. 2012)); *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007) (an unlawful employment practice under Title VII is established when a plaintiff demonstrates that a protected characteristic, such as gender, was a motivating factor for an employment decision); see also *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 n.3 (7th Cir. 2009) ("We apply the same analytical framework to employment discrimination cases whether they are brought under the ADEA or Title VII.").

The Court agrees that Plaintiff has provided no evidence to support her claims of discrimination based on either her age or her gender. First, Plaintiff does not address these claims at all in her response to Defendant's summary judgment motion, instead focusing exclusively on her disability discrimination claim and her retaliation claims. [See 28.] Therefore, Plaintiff has abandoned these age and gender discrimination claims by failing to adequately develop arguments relating to them. See *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (holding that the plaintiffs had waived claims where they did not respond to defendant's arguments and "did not provide the district court with any basis to decide" them); see also *Huang v. Continental Cas. Co.*, 2012 WL 104628, at *6 (N.D. Ill. Jan. 12, 2012) ("A party abandons a claim by failing to address it in his response brief to a motion for summary judgment.") (citing *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005); *Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003)).

Even if these claims were not abandoned, however, they would still fail because there is no evidence from which a fact finder could conclude that Plaintiff suffered any adverse employment actions on the basis of her age or her gender. Regarding gender discrimination, Plaintiff testified that Defendant hires men over women generally. Plaintiff also testified that she had heard that certain less-qualified males were given positions that she applied for; however,

there is no evidence in the record as to when these males were hired or what their qualifications were. [22-3, ¶ 77; 28, Ex. A, 162:15–165:12.] Regarding age discrimination, Plaintiff testified that, several years prior to her deposition, she had seen two women over the age of 60 terminated after working for Defendant for long periods of time. [22-3, ¶ 78; 28, Ex. A, 175:17–180:1.] However, Plaintiff admits that no member of management or human resources ever made any derogatory comments about her age or her gender, and two of the jobs that she applied for during her medical leave were filled by women over the age of 40. [28-1, ¶¶ 59, 63, 79.] Plaintiff's general allegations, without more, do not suffice to demonstrate that Plaintiff suffered any adverse employment action based on either her age or her gender. See *Hoosier v. Greenwood Hospitality Mgmt. LLC*, 32 F. Supp. 3d 966, 976 (N.D. Ill. 2014) (granting summary judgment on Title VII claims because "[a] plaintiff's bare or conclusory assertion that an employer mistreated her because of her protected status" is not sufficient to demonstrate a causal link); see also *Winsley v. Cook Cty.*, 563 F.3d 598, 605 (7th Cir. 2009) (noting that "vague assertions" by a plaintiff regarding the more favorable treatment of other employees do not suffice to meet the plaintiff's burden of proof on summary judgment in the context of a Title VII discrimination claim). Therefore, Defendant is entitled to summary judgment on Counts I and II of Plaintiff's complaint.

**B.    Disability Discrimination Claim (Count III)**

In Count III of her complaint, Plaintiff brings a disability discrimination claim against Defendant based on both disparate treatment and on a failure to provide a reasonable accommodation. [See 1, ¶¶ 39–43.] Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim in Count III because Plaintiff cannot establish that she is a qualified individual with a disability, and thus fails to meet her burden of proof on both theories. [See 22-1, at 3–6.]

The ADA "prohibits employers from taking adverse employment actions against their employees because of a disability." *Fleishman*, 698 F.3d at 606; see also 42 U.S.C. § 12112(a). To establish a violation of the Act an employee must show "'1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation.'" *Winsley*, 563 F.3d at 603 (quoting *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000)). "To survive a motion for summary judgment, a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements of [her] claim." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013). "No matter the type of discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that he was 'a *qualified individual* with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997) (emphasis added).

Under the ADA, a "qualified individual with a disability" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The employee must "pass a two-step test" to be a "qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, *etc.*'" *Id*. "Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id*. Again, "the burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 484, 484 (7th Cir. 1997).

The parties here do not dispute that Plaintiff is an individual with a disability; the Court therefore assumes that Plaintiff satisfies the first element of a disability discrimination claim. The parties also do not dispute that Plaintiff meets the prerequisites of the handler position. Instead, Defendant argues that Plaintiff has failed to establish that she can perform the essential functions of the handler position, either with or without a reasonable accommodation, and therefore fails to establish that she is a qualified individual with a disability.

In order to determine whether a job function is essential, courts "look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005)); see also 29 C.F.R. § 1630.2(n)(3). The employer's judgment, while important, is not a controlling factor; courts "also look to evidence of the employer's actual practices in the workplace." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285–86 (7th Cir. 2015) (quoting *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011)). It is Plaintiff's burden to demonstrate a triable issue of fact as to whether she was a "qualified individual" at the time she was fired in 2015. *Id.* at 285.

To determine whether Plaintiff has met this burden, the Court first considers what the essential functions of the handler position are. There is no serious dispute between the parties that lifting and moving packages—specifically, loading and unloading packages from cans and trucks—is the primary job responsibility of a handler at the UGN Station. [28-1, ¶¶ 24–27.] Defendant contends that an essential function of this responsibility is frequently lifting and moving packages, over the handler's waist and head, that may weigh up to 75 pounds. [22-1, at 4.]

Defendant has presented overwhelming evidence to support that this is the case. First, the written description of the handler position requires that handlers be "[a]ble to lift 75 lbs." [28, Ex.

14 to Ex. A.] While certainly not dispositive, this written job description is entitled to some weight. See *Basith v. Cook Cty.*, 241 F.3d 919, 928 (7th Cir. 2001); *Newell v. Alden Vill. Health Facility for Children & Young Adults*, 2014 WL 6757928, at *4 (N.D. Ill. Dec. 1, 2014), aff'd, 651 F. App'x 556 (7th Cir. 2016); see also *Dobosz v. Quaker Chem. Corp.*, 2016 WL 4376528, at *12–14 (N.D. Ind. Aug. 16, 2016) (determining on summary judgment that lifting, pushing, and pulling over 30 pounds and overhead work were essential functions of position after considering the written job description in conjunction with plaintiff's own deposition testimony about his position and an assessment by other employees of defendant corporation).

Second, the uncontroverted descriptions of the volume and flow of packages at the UGN Station, as well as the descriptions of the cans and trucks themselves that must be loaded and unloaded, support Defendant's contention that a handler would need to lift packages over her waist and over her head as an essential function of her job responsibilities. The cans that handlers must load and unload have packages stacked to heights of 7.5 or 8 feet, and handlers must unload approximately 1,000 of these packages per hour in the morning and load 400–500 of these packages per hour in the evening. Fifty percent of these packages weigh over 15 pounds, and some of those will necessarily be stacked over a person's head or waist if the packages are stacked to such heights. This is supported by the testimony of workers at the UGN Station who hold or have held the position of handler, including Plaintiff. Brush, a senior manager who oversaw the handler position, testified that a handler would have to lift a package above his or her waist roughly 50 percent of the time to load or unload cans, or 33 percent of the time to load or unload a truck. Brush also testified that a handler of Plaintiff's height would need to lift a package over her head 20 to 33 percent of the time when loading or unloading a truck, depending on how full the truck is. [28, Ex. D, 106:5–107:10.] Mroz, who has worked for Defendant as both a handler and as a

courier, testified that to unload cans in the morning, a handler would have to reach overhead to unload packages that weigh five or fifteen pounds on a "daily" basis. [28, Ex. B, 43:4–44:1.] Plaintiff testified that, in order to get packages out of the cans, she would sometimes have to raise her hands up and get packages over her head. [28, Ex. A, 105:20–106:10.] Plaintiff also testified that, on her first day as a handler in April 2015, she was required to lift packages from her waist to her shoulder that weighed 20–30 pounds. [*Id.*, 103:15–104:12.] See *Majors*, 714 F.3d at 534 (where written job description stated that moving heavy objects was an essential job function, and other employees confirmed it, agreed with district court that such moving of heavy objects was an essential function of position plaintiff sought); *Walker v. United Parcel Serv.*, 2015 WL 735779, at *10 (S.D. Ind. Feb. 20, 2015) (no dispute that lifting and carrying packages weighing up to 70 pounds was an essential job function of the loader/unloader position at defendant, where plaintiff admitted that she was responsible for frequently doing so); see also *Miller*, 643 F.3d at 200 (reversing grant of summary judgment on ADA discrimination claim where a reasonable jury could conclude that, in practice, "essential" functions of position could be shared between team members such that plaintiff would be able to perform in his job).

Plaintiff has not raised a material dispute of fact that this lifting of packages over the waist and head is an essential function of the handler position. Plaintiff vigorously disputes whether, as a matter of Defendant's policy or as a matter of actual practice, this function encompassed a requirement that a handler at the UGN Station lift a 75-pound package over her waist or over her head. [28, at 7.] Plaintiff points to evidence in the record that, in reality, handlers are never required to lift a package that heavy over their waist or their head. Therefore, according to Plaintiff, the lifting of 75-pound packages over one's waist is not an essential function of the handler position, notwithstanding the written requirement that handlers be able to lift 75 pounds.

Construing the record in Plaintiff's favor, there certainly is a material dispute as to whether lifting a package that weighs 75 pounds over the waist and head is an essential function of the handler position, considering that several employees testified that they had never heard of a requirement to do so.  However, this dispute is immaterial, as Plaintiff has not presented any evidence from which a fact finder could infer that a handler at the UGN Station would *never* have to lift *any* of the packages moving through the station over her waist or overhead, particularly those weighing more than her weight restrictions but less than 75 pounds.  Plaintiff only disputes that this would have to happen "frequently," pointing to Mroz's deposition testimony as evidence that such lifting was not a frequent part of the handler position.  Mroz noted that sometimes a handler can avoid reaching up high to pull down packages:  if, for example, a can is stacked poorly, packages will fall, and if a can is stacked well handlers can pull out packages from shoulder height without reaching up.  [28, Ex. B, 46:21–47:19.]  However, this testimony does not establish that reaching overhead and over the waist to load and unload packages was *not* an essential function of the handler position at the UGN Station.  At most it raises a question about how frequently this action is performed.  But considering that the parties do not dispute that loading and unloading packages was the main responsibility of the UGN Station handler, the fact that such lifting may not be needed with every package—or even most packages—does not make the ability to lift these packages non-essential, as the Seventh Circuit has explained.  See *Basith*, 241 F.3d at 929 ("[A]n essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential.  Rather, an essential function must be a fundamental duty of the job.") (citation omitted); see also *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (affirming determination that heavy lifting was essential function of plaintiff's job and noting that even the plaintiff "admits that heavy lifting is required at times, and his argument that such lifting

is infrequent does not preclude it from being an essential function of the job"); *cf. Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2014) (reversing grant of summary judgment to employer; where hairdresser at nursing home could not wheel patients to and from the on-site beauty parlor, evidence in the record could lead a factfinder to conclude that this was such a small part of her hairdressing duties that the ability to do so was not essential).

The Court next considers whether Plaintiff could perform the essential function of the job without an accommodation. Plaintiff's lifting restrictions, as they were in place in April 2015, restricted her from lifting more than 75 pounds frequently from floor to waist, 15 pounds frequently from waist to shoulder and 30 pounds occasionally from waist to shoulder, and 5 pounds overhead on a limited basis (or 15 pounds with left hand assist). [28, Ex. 17 to Ex. A.] It is uncontroverted that 50 percent of the packages moving through the UGN Station in 2015 weighed more than 15 pounds. [28-1, ¶ 33.] This means that more than 50 percent of the packages moving through the UGN Station at the time Plaintiff was employed as a handler there were heavier than her weight restrictions would allow her to lift over her waist on a frequent basis. Therefore, Plaintiff could not perform the essential function of this position without an accommodation. See *Majors*, 714 F.3d at 534 (when lifting objects weighing over twenty pounds is essential function of position, restriction prohibiting plaintiff from lifting more than twenty pounds meant she could not perform an essential function of position without an accommodation); *Dobosz*, 2016 WL 4376528, at *14 (plaintiff's permanent lifting restrictions prevented him from performing essential functions of position without an accommodation); *Walker*, 2015 WL 735779, at *10 (same).

Closely related to Plaintiff's argument that lifting 75 pounds above her waist and her shoulder is not an essential function of the handler position, Plaintiff again disputes that she was unable to perform the essential functions of the position. Specifically, Plaintiff argues first that in

reality, nobody lifts 75 pounds overhead as a handler at the UGN Station and, second, Plaintiff was able to work as a handler for almost three weeks without any issues, thus demonstrating that she was qualified to perform the essential functions of the handler position. [28, at 12–13.]

Plaintiff relies on one unreported district court case to support her argument. See *Crain v. Roseville Rehabilitation & Health Care*, 2017 WL 1075070 (C.D. Ill. Mar. 21, 2017). In *Crain*, a certified nursing assistant was placed under permanent lifting restrictions after shoulder surgery: after receiving those restrictions, she continued working as a nursing assistant for six years. When her employer was sold to a new company, she was eventually let go from her position because, according to her employer, these lifting restrictions prevented her from being able to perform the essential functions of her position. *Id.*, at *2. The district court held, however, that Plaintiff had raised a material question of fact as to whether she was a qualified individual under the ADA because plaintiff testified that she was able to perform in this position for years, and other employees opined that as a practical matter a nursing assistant would not be prevented from performing any of the essential functions of her position based on the plaintiff's restrictions. *Id.* at *5.

*Crain* provides no real help to Plaintiff. First, for the reasons discussed above, Plaintiff has not produced evidence that raises a dispute about whether lifting packages over her head and waist would be an essential function of her job, if those packages weighed less than 75 pounds. Second, while the Court accepts that Plaintiff worked as a handler for almost three weeks without complaint, this does not demonstrate that she was qualified to perform the essential functions of the handler position. If Defendant allowed her to work as a handler without any accommodations, it would be ignoring her doctor-imposed lifting restrictions, which Defendant is not required to do under the ADA. See *Newell*, 2014 WL 6757928, at *5 ("It is well established that the ADA does

not require an employer to disregard documented, uncontroverted medical restrictions.") (citing *Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 484–85 (7th Cir. 2002)); see also *Majors v. Gen. Elec. Co.*, 2012 WL 2912726, at *7 (S.D. Ind. July 16, 2012) (noting that, while plaintiff asserted that ignoring her lifting restrictions would be a reasonable accommodation, disregarding an uncontroverted medial restriction is not required by the ADA, and "to do so could open the employer up to separate ADA liability for failure to abide by restrictions"); *Dobosz*, 2016 WL 4376528, at *14 (granting summary judgment on ADA claim because plaintiff's own testimony showed that lifting certain weight was essential function of his job, and the fact that plaintiff had previously done work involving lifting weights in excess of his lifting restrictions did not raise a genuine issue of material fact as to whether he was a qualified individual under the ADA).[3]

The Court now considers whether Plaintiff can perform the job with an accommodation. Plaintiff argues that she does not require any "special accommodation," but that evidence shows that when a package is too heavy or unwieldy at the UGN Station, it is accepted practice to ask for help in lifting that package. [28, at 15.] However, as previously discussed, Plaintiff would need help lifting approximately 50 percent of the packages flowing through the UGN Station over her waist and over her head. Even accepting that asking for help from other employees is an accepted practice at the UGN Station, Defendant is not required to essentially waive the handler lifting requirement for Plaintiff. See *Majors*, 714 F.3d at 534 ("To have another employee perform a

---

[3] Plaintiff also points to an April 22, 2015 e-mail in which Brush stated that there were "only 2 outcomes" in reference to Plaintiff: "She is released to full duty," or "She is terminated for not disclosing her physical limitations during the application process." [28, Ex. K.] Plaintiff argues that this e-mail follows the receipt of Plaintiff's new lifting restrictions and implies that Brush thought Plaintiff could still work as a handler. [28, at 9.] However, there is no evidence in the record of when Brush received Plaintiff's new lifting restrictions. Even assuming that Brush had received them as of the date of this e-mail, the fact remains that Defendant was not required to ignore Plaintiff's documented restrictions under the ADA for the reasons stated above.

position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation.") (citing *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996)); see also *Peters*, 311 F.3d at 845–46 (request to have someone else do the heaviest lifting if plaintiff could not handle that is an unreasonable accommodation); *Severson v. Heartland Woodcraft, Inc.*, 2015 WL 7113390, at *6–7 (E.D. Wis. Nov. 12, 2015) (because lifting was an essential function of position, requiring defendant to reallocate lifting duties to other employees would not be a reasonable accommodation).[4]

Plaintiff also makes another argument regarding the circumstances of her re-hire in April 2015 that, she contends, raises a material dispute of fact regarding her ADA claims. Plaintiff argues that at the March 2015 meeting with Charles, Charles promised Plaintiff that she would only have to offload trucks and after three weeks Charles would get Plaintiff a courier position instead. [See 28, at 3; 28-2, ¶ 5.]

Although Plaintiff does not explicitly make this argument, her contentions regarding Charles' separate promises to her could be construed as an argument that she was being provided with a reasonable accommodation in the handler position and, therefore, she was a qualified individual with a disability as defined by the ADA. To the extent Plaintiff intends to make this argument, it is a nonstarter. Even if the promise that Plaintiff would only be working as a handler for three weeks before being able to work as a courier had been made, it does not change the conclusion that she was not a qualified individual. Indeed, Plaintiff herself testified that couriers and handlers have the same lifting requirements. [28, Ex. A, 134:11–19.] Regarding the promise that she would only have to unload, not load, trucks, even if Plaintiff only performed modified

---

[4] Additionally, because Plaintiff was the only handler employed at the UGN Station in April 2015, this is not a situation where the lifting duties could be shared among team members such that, even if some employees could not lift all packages, the team as a whole would be able to perform that function. See, *e.g.*, *Miller*, 643 F.3d at 199–200.

duties as a handler for the three weeks she was employed as an accommodation for her lifting restrictions, that does not mean that these accommodations were reasonable. See *Sieberns*, 125 F.3d at 1023; *Basith*, 241 F.3d at 930 ("If the employer bends over backwards to accommodate a disabled worker * * * it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.") (quoting *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995)); see also *Vraniskoska v. Franciscan Cmtys., Inc.*, 2013 WL 4647224, at *8 (N.D. Ind. Aug. 29, 2013) ("[T]he fact that [defendant] had accommodated [plaintiff] during this period is not evidence that it altered the essential functions of the position."); *Rivera v. Principi*, 2001 WL 1249051, at *7 (N.D. Ill. Oct. 16, 2001) ("[T]he VA * * * was not required to restructure Rivera's position or the position of other employees in order to accommodate his disability.").

Plaintiff finally contends that her ADA claims survive summary judgment because the differences in her accommodation denial letters in 2013 and 2015 demonstrate clear pretext for Plaintiff's termination. [28, at 13.] Specifically, Plaintiff argues that the May 2015 letter she received from Ramos denying her an accommodation reference a requirement to lift 75 pounds over the waist and overhead, which was not an actual requirement of the handler position. However, because Plaintiff has not pointed to any evidence that would allow a jury to determine that she was a qualified individual with a disability, she has not established a *prima facie* case of discrimination, and the Court need not analyze her pretext argument. See *Majors*, 714 F.3d at 536.

In sum, Plaintiff has failed to raise a triable issue of fact regarding her status as a qualified individual covered by the ADA, which is required to proceed with her claims of disparate treatment and failure to accommodate. Defendant is therefore entitled to summary judgment on Plaintiff's disability discrimination claim in Count III.

## C. ADA Retaliation Claim (Count III)

Plaintiff also brings a retaliation claim under the ADA in Count III. Although the Court has granted summary judgment on Plaintiff's discrimination and failure to accommodate claims, the viability of Plaintiff's retaliation claim does not turn on the viability of these underlying ADA claims. See *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) ("The fact that Turner is not disabled under the ADA is not fatal to his retaliation claim."). "The [ADA] prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). To prove her retaliation claim, Plaintiff must present evidence of "(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two." *Id.*

Plaintiff contends that she complained about disability discrimination in 2013 after her first period of employment was terminated by making a complaint through Defendant's GFT process, speaking to Ramos and HCMP Advisor Todd Bell, and by writing a letter to someone about her treatment. [22-3, ¶¶ 68, 70.] Defendant argues that it is entitled to summary judgment on Plaintiff's ADA retaliation claim because she cannot establish the required causal link between these 2013 complaints of discrimination and her placement on medical leave and termination in 2015 based on the time gap between these two events. [22-1, at 12–13.] Plaintiff responds that she has presented sufficient evidence to create a material dispute on the issue of causation because she has presented evidence of retaliation beyond the timing of events, including (1) the repeated references to her 2013 lifting restrictions in the communications about her in 2015; (2) e-mails discussing how Plaintiff got past recruitment in April 2015; and (3) Defendant's inconsistencies

in its explanation for how Plaintiff's superiors became concerned about Plaintiff's re-hire. [28, at 16–17.]

A retaliation claim requires proof of but-for causation. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)) (elements of a Title VII retaliation claim); see also *Pinkston v. City of Chi.*, 2017 WL 4340155, at *10 (N.D. Ill. Sept. 29, 2017) (noting that the elements of a retaliation claim are the same under Title VII and the ADA). The Seventh Circuit recently jettisoned the long-standing practice of distinguishing between the "direct" and "indirect" methods of analyzing retaliation claims. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–66 (7th Cir. 2016). *Ortiz* instructs courts to focus on a more straightforward inquiry: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord*, 839 F.3d at 563; see also *Ortiz*, 834 F.3d at 765 ("Th[e] legal standard * * * is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's * * * proscribed factor caused the discharge or other adverse employment action."). The Court is to consider the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Id.*

Direct evidence, such as an admission by the employer of unlawful animus, is sufficient to demonstrate a causal connection, but rare. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). A plaintiff may "also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination." *Id.* (citation and internal quotation marks omitted). Circumstantial evidence may include suspicious timing, ambiguous statements or behavior towards protected employees, evidence, statistical or otherwise, that similarly situated employees systematically receive better treatment, evidence that the employer offered a pretextual reason for an adverse employment action, and any other relevant information that could permit an inference

of retaliation. See *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Rao v. Gondi*, 2017 WL 2445131, at *20 (N.D. Ill. June 5, 2017).

The Court agrees that Plaintiff has not presented any evidence of a causal link between her 2013 disability discrimination complaints and her termination in 2015 that would permit an inference of retaliation. The timing of these events—the complaints being first in time in 2013, followed by the termination in 2015—does not by itself support such an inference because there is nothing suspicious about this timing. See *Han v. Whole Foods Market Grp., Inc.*, 44 F. Supp. 3d 769, 798 (N.D. Ill. 2014) (two years between complaint and termination "belie[s] the existence of a causal connection) (citing *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006)). Even if these two events had happened closer in time to each other, temporal proximity alone is insufficient to establish a causal connection for a claim of retaliation. See *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). A plaintiff must go beyond "[s]peculation based on suspicious timing" and "produce facts which somehow tie the adverse decision to the plaintiffs' protected actions." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000); *Tomanovich*, 457 F.3d at 665. Some "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek*, 202 F.3d at 918.[5]

---

[5] An exception would be if the adverse action occurs "on the heels of protected activity," (*i.e.*, within days or weeks of the protected activity). See *Mobley*, 531 F.3d at 549. Here, there are two years separating Plaintiff's complaints and her ultimate termination after her second period of employment in 2015. Plaintiff attempts to shorten this time period by noting that her appeals of her complaints were not denied until February 2014, but she provides no evidence to support this fact. [28-2, ¶ 31.] Even if the Court were to accept this fact, however, this timing is not enough on its face to provide an inference of causation because there is still over a year between her discrimination complaints and the adverse actions that Plaintiff complains of. Plaintiff also tries to shorten the time period between her discrimination complaints and her termination by pointing to the fact that she continued to apply for jobs with Defendant between her first and second periods of employment. However, there is no evidence in the record of what jobs she applied for or when she applied for them.

Even assuming Plaintiff's 2013 complaints are considered protected activities, Plaintiff has not produced any other facts tying her placement on medical leave, her failure to obtain other positions at the company while on medical leave, and her termination in 2015 to those complaints. Plaintiff points to references to her earlier lifting restrictions by individuals whom she claims knew about her discrimination complaints and the inconsistencies in various individuals' statements about whether she was complaining about pain while working in April 2015. But accepting that these references to Plaintiff's earlier lifting restrictions were made does not raise an inference that Plaintiff's discrimination complaints were also being discussed or considered. Additionally, any knowledge of her previous employment and her previous lifting restrictions does not automatically lead to an inference that these employees knew about her discrimination complaints. Plaintiff further has not presented any evidence that Fowler, Brush, or Charles knew about her previous complaints in 2013. In short, Plaintiff has not presented any evidence from which a trier of fact could infer that her employment in 2015 was terminated because of her disability discrimination complaints in 2013. See *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624–25 (7th Cir. 2012) (affirming summary judgment for employer on ADA retaliation claim because timing alone was insufficient to create a genuine issue of material fact, and the other evidence plaintiff put forward was unrelated to her harassment complaint); *Perez v. Transformer Mfrs., Inc.*, 35 F. Supp. 3d 941, 954 (N.D. Ill. 2014) (derogatory comments about plaintiff that did not refer, even obliquely, to discrimination charge were not enough to show causal connection between that charge and adverse employment action to support a retaliation claim). Therefore, Defendant is entitled to summary judgment on the retaliation claim in Count III.

### D. State Law Retaliatory Termination Claim (Count IV)

Given the foregoing conclusion that Defendant is entitled to summary judgment on Plaintiff's federal claims under the ADEA (Count I), Title VII (Count II), and the ADA (Count III), the Court must consider whether to exercise its supplemental jurisdiction over Plaintiff's remaining state law retaliatory discharge claim (Count IV). Where a district court has original jurisdiction over some claims, it has supplemental jurisdiction over other claims that are so related that they form part of the same case or controversy. 28 U.S.C. § 1367(a); *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). If the court has dismissed all claims over which it has original jurisdiction, the court's supplemental jurisdiction persists, but the court has discretion to decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3); *Miller*, 600 F.3d at 738 (noting that the decision whether to exercise supplemental jurisdiction is "squarely within [the district court's] discretion.").

As the Seventh Circuit has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). However, exceptions to this general rule exist:

> (1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008) (citation and internal quotation marks omitted). In this instance, the Court concludes that exceptions (2) and (3) above both apply. The Court has devoted considerable resources to sorting out both the facts and the law in this case, and the federal and state law claims rest on the same core set of operative facts. Prudence dictates that the Court resolve the state law claim to avoid duplication of judicial effort, especially where (as

here) the application of state law to the dispositive causation element of the state law cause of action is abundantly clear.

"Generally, an at-will employee may be discharged for any reason or for no reason at all." *Roger v. Yellow Freight Sys., Inc*., 21 F.3d 146, 149 (7th Cir. 1994). In Illinois, however, it is unlawful to terminate an employee in retaliation for exercising her rights under the Illinois Worker's Compensation Act ("IWCA"). *Beatty v. Olin Corp.*, 693 F.3d 750, 753 (7th Cir. 2012); *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978). For claims alleging retaliatory discharge for the exercise of IWCA rights, a plaintiff must show that: (1) she was employed by the defendant before being injured; (2) she exercised a right under the IWCA; and (3) her discharge was causally connected to the exercise of her right. *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012) (citation omitted).

To establish a causal relationship, Plaintiff must affirmatively show that the discharge was primarily in retaliation for her exercise of a protected right (her worker's compensation claim). *Gordon*, 674 F.3d at 774. In other words, Plaintiff must present "sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *Id.* (citing *Roger*, 21 F.3d at 149); see also *Hartlein v. Ill. Power Co*., 601 N.E.2d 720, 730 (Ill. 1992) (the ultimate issue to be decided is the employer's motive in discharging the employee); *Williams v. Office of Chief Judge of Cook Cty. Ill.*, 839 F.3d 617, 622 (7th Cir. 2016) ("So long as the reason for a discharge is wholly unrelated to an employee's claim for benefits, the employer is not liable for retaliatory discharge.")

Defendant argues that it is entitled to summary judgment on this claim for two reasons: first, Plaintiff's claim retaliatory discharge claim is barred by the agreed shortened contractual limitations period contained in the employment agreement that she signed, and second, Plaintiff's

claim fails on the merits. [22-3, at 14–15.] Plaintiff, in turn, argues that the employment contract between Defendant and Plaintiff is not enforceable because Plaintiff did not sign it, and that her state law retaliation claim should not be dismissed on the merits. [28, at 17–18.]

The Court need not address Defendant's statute of limitations argument because, even if the Court were to accept Plaintiff's contentions that the shortened limitations period in the handler employment contract is unenforceable, Plaintiff has not presented any evidence from which a trier of fact could conclude that plaintiff's termination was causally connected to her worker's compensation claim. Plaintiff filed her only worker's compensation claim in 2011. [22-3, ¶ 11.] She was terminated from her second period of employment in 2015. The only evidence that Plaintiff has put forward to connect these two events is that Charles, Ramos, and Wibright knew about Plaintiff's 2011 claim and Plaintiff's statement that "everyone knew" she was still receiving benefits when she returned to Defendant in 2015. [22-3, ¶ 75; 28-1, ¶ 76; 28-2, ¶¶ 16–17.] But Plaintiff has not put forward any evidence that these employees referenced her worker's compensation claim at any point in 2015 or considered it as a factor in her ultimate termination. Simply put, the only evidence of causation that Plaintiff puts forward is the fact that she filed a worker's compensation claim in 2011 and was then fired four years later, which is not enough to support her retaliatory discharge claim. See *Bourbon v. Kmart Corp.*, 223 F.3d 469, 473 (7th Cir. 2000) (temporal proximity alone is insufficient to prove that an employer's reason for terminating plaintiff was pretextual); *Perez*, 35 F. Supp. 3d at 955 (temporal proximity alone is insufficient to create a genuine issue of material fact). Because Plaintiff has not put forward any evidence on which the Court could rely in finding a causal connection between her worker's compensation claim and her termination, Defendant is entitled to summary judgment on Count IV.

## IV.    Conclusion

For the reasons stated above, Defendant's motion [22] for summary judgment is granted, and  Plaintiff's motion [35] to strike is denied.  The Court will issue final judgment and close the case.

Dated: August 21, 2018

_____
Robert M. Dow, Jr.
United States District Judge