# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JANET KOTASKA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-9321 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In a prior opinion [42], the Court granted summary judgment against Plaintiff Janet Kotaska on all counts in her suit against her former employer, Defendant Federal Express Corporation. Currently before the Court is Plaintiff's motion for reconsideration [45] of the Court's ruling on her claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. For the reasons explained below, Plaintiff's motion [45] is denied.

**I. Background[1]**

The full background of this case is set forth in the Court's summary judgment opinion, knowledge of which is assumed here. See [42, at 2–18]. Nonetheless, the Court will set forth the facts and procedural history relevant to the instant motion.

Plaintiff worked for Defendant on two different occasions. From 1998 to 2013 she worked at UGN Station, first as a courier handler and then as courier. She was terminated at the end of this first period after she suffered an injury on the job and failed to secure another position that she could perform within the permanent lifting restrictions imposed by her doctor after that injury. [42, at 6–7.]

---

[1] The Court takes all facts as previously established at summary judgment unless otherwise noted.

In 2014, however, Plaintiff's physician updated her permanent lifting restrictions to what they are today. These restrictions read as follows:

> With regards to work, [Plaintiff] is cleared for light duty activity. I believe that we could, in fact, increase some of her weight restrictions. At this point permanent restrictions would include frequent lifting up 75 pounds from the floor to waist, 15 pounds frequently from the waist to shoulder and 30 pounds on occasional basis. She should limit overhead use to only limited frequency and only up to 5 pounds. She could lift up to 15 pounds overhead with left hand assist.

[*Id.* at 7 (quoting [28, Ex. 17 to Ex. A.]).] After that revision, Plaintiff secured a handler position at UGN Station and began working there on April 6, 2015. [42, at 7, 12.] Within a week of her start date, one of Defendant's human resources personnel—who knew of Plaintiff's previous employment and termination—advised Plaintiff's Human Capital Management Program Advisor, Bradley Fowler, of Plaintiff's history and her 2013 lifting restrictions. [*Id.* at 12.] Shortly thereafter, Fowler launched an investigation to determine whether Plaintiff could continue working as a handler at UGN Station. [*Id.* at 12–15.] At the investigation's conclusion, Defendant placed Plaintiff on an involuntary leave of absence and eventually terminated her on July 23, 2015, after she again failed to find a position she could perform consistent with her amended lifting restrictions. [*Id.* at 15–17.]

After properly exhausting the administrative process, Plaintiff filed the instant suit against Defendant in September 2016. See [1]. In her complaint, Plaintiff brought claims against Defendant for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (Count I); gender discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count II); disability discrimination and retaliation in violation of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. §§ 12010 *et seq.* (Count III); and retaliatory termination in violation of state law (Count IV). [*Id.*]

On October 23, 2017, Defendant moved for summary judgment arguing, among other things, that Plaintiff had failed to demonstrate that she could pursue a claim under the ADA as a qualified individual with a disability.[2] See [22]. On August 21, 2018, the Court resolved that motion in Defendant's favor, concluding in relevant part that Plaintiff had failed to show that she could perform the essential functions of the handler position even with an accommodation, and therefore had not shown she was a qualified individual. See [42, at 29–31]. Specifically, the Court concluded that Plaintiff had not shown she could perform, even with a reasonable accommodation, the essential function of lifting packages over her waist and overhead given her weight restrictions and the undisputed facts regarding the packages processed at UGN Station. [*Id.*] Shortly thereafter, Plaintiff filed the instant motion for reconsideration. [45.]

## II. Standard

The Federal Rules of Civil Procedure do not provide an explicit basis for a motion to reconsider. However, the Court will address her motion under Federal Rule of Civil Procedure 59(e), as Plaintiff has requested. See [48, ¶ 3 (asserting that Plaintiff's motion should be considered under Fed. R. Civ. P. 59(e))]. Under Rule 59(e), a party may file a motion to alter or amend a judgment within 28 days that judgment's entry. To prevail on such a motion, "'the movant must demonstrate a manifest error of law or fact or present newly discovered evidence.'" *Ritacca v. Storz Medical, A.G.*, 298 F.R.D. 566, 568 (N.D. Ill. 2014) (quoting *Boyd v. Tornier, Inc.*, 656 F.3d 487, 492 (7th Cir. 2011)). In regard to the "manifest error" prong, the Seventh Circuit has explained that a motion to reconsider is proper only when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v.*

---

[2] Because Plaintiff only seeks reconsideration of the Court's decision regarding Count III, the Court only includes its conclusions regarding that count in this summary.

*Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); see also *Wiegel v. Stork Craft Mfg., Inc.*, 2012 WL 2130910, at *2 (N.D. Ill. June 6, 2012) ("Reconsideration is not appropriate where a party seeks to raise arguments that could have been raised in the original briefing."). Likewise, "[a] 'manifest error' is not demonstrated by the disappointment of the losing party," instead it "is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citation omitted). Because the standards for reconsideration are so exacting, our court of appeals has stressed that issues appropriate for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee*, 906 F.2d at 1191. Motions for reconsideration are inappropriate for relitigating arguments that the Court previously rejected or for arguing issues that could have been raised while Court initially considered the motion now on reconsideration. *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 512 (7th Cir. 2007); *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). Finally, the resolution of a motion for reconsideration is left to the discretion of the district court. *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1305 (7th Cir. 1991).

### III.  Analysis

Plaintiff asserts that the Court misapprehended the facts and/or made impermissible inferences when it concluded that (1) an essential function of the Handler position was lifting and moving packages that weighed more than Plaintiff's lifting restrictions, but less than 75 pounds, above her waist and overhead, and (2) that Plaintiff could not perform that function even with an accommodation. See [42, at 26–27]. Specifically, Plaintiff asserts that the record does not support the Court's conclusions (1) that 50 percent of the packages processed by UGN station weighed 15 pounds or more and (2) that Plaintiff would be required to lift any of those packages above her

4

waist and overhead. These two mistaken assumptions, Plaintiff argues, led the Court to erroneously conclude that she was not a qualified individual. Defendant counters that Plaintiff is attempting to shift the burden of persuasion, and that in fact, Plaintiff failed to "come forward with evidence that she would have been able to perform the essential functions of the Handler position, primarily the loading and unloading of cans, without having to lift packages above her weight restrictions over her waist and overhead." [50, at 3–4.]

The Court turns first to Plaintiff's argument regarding the average package weight at UGN Station. At summary judgment, Plaintiff admitted Paragraph 33 of Defendant's statement of material facts. That paragraph states "[t]he average weight of packages traveling through UGN Station in 2015 was approximately 15 pounds, which means that 50% of the packages moving through UGN station weighed more than 15 pounds." [28-1, ¶ 33 (admitting the statement).] Now, however, Plaintiff disputes the second half of the admission, asserting that the second clause does not follow from the first and therefore lacks adequate support in the record.

Plaintiff is partially correct. The word "average" generally denominates the "mean"—the sum of an entire set of values divided by the number of values in the set—and not the "median"—the value in a set of values that half of the values in the set exceed and half fall below. Thus, the fact that packages at UGN Station weighed 15 pounds on average does not necessarily establish that half of the packages processed at UGN Station weighed more than 15 pounds. However, Peter Brush—whose testimony underlies the factual assertion made in Paragraph 33—testified not only that the average weight of a package at UGN station was 15 pounds, but that "50% of the packages that [went] through the facility [were] above 15 pounds." [22-9, at 4.] Brush's testimony, based on his tenure as a senior manager of operations at FedEx, was plausible on its face. And, regardless

5

of whether Brush's statement was mistaken—or confused the concepts of mean and median—Plaintiff did not present any evidence to suggest otherwise at summary judgment.

Nevertheless, Plaintiff now argues that Defendant has not shown that half of the packages at UGN Station weighed more 15 pounds. But, as just explained, Brush's testimony says exactly that. One reason that this district's local rules require citations to the record at the summary judgment stage is to allow the parties and the Court to understand the basis on which a factual assertion rests. Because summary judgment is the "put up or shut moment" in litigation "when a party must show what evidence it has that would convince a trier of fact to accept its version of events" (*Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)), it was incumbent on Plaintiff to contest any part of Brush's testimony with which she had a dispute. If Plaintiff was skeptical about the "reports" which Brush cited as the basis for his assertion, she could have explored that at the deposition or elsewhere during discovery. Plaintiff has failed to provide any justification or case law to support the notion that she may now contest a fact that she conceded at summary judgment. The Court therefore could, and did, properly accept as an undisputed fact that 50 percent of the packages at UGN station weighed more than 15 pounds.

The Court next turns to Plaintiff's broader argument that the record fails to support the Court's conclusion that she was not a qualified individual under the ADA. As the Court previously concluded—and Plaintiff now concedes—an essential function of the handler position is moving and lifting packages over the waist and head. See [42, at 25]; [45, at 12]. Thus, whether Plaintiff is a "qualified individual" under the ADA given her medical restrictions turns on the necessity of, and/or Plaintiff's ability to perform, four tasks that are component parts of that essential function: (1) maneuvering packages of more than 15 pounds at heights above Plaintiff's waist ("Task 1"), (2) maneuvering packages of 15 pounds or less above Plaintiff's head ("Task 2"), (3) maneuvering

packages of more than 30 pounds above Plaintiff's waist ("Task 3"), and (4) maneuvering packages of more than 15 pounds above Plaintiff's head ("Task 4") (collectively "the Tasks"). If the frequency with which Tasks 1 & 2 must be performed exceed Plaintiff's limits—occasionally with regard to Task 1, and with "limited frequency" as to Task 2—or if Tasks 3–4 are essential functions of the handler position, Plaintiff is not a qualified individual under the ADA.

Plaintiff argues that her claim should have survived summary judgment because Defendant had the burden of demonstrating the essential functions of the handler position and failed to show that (1) Tasks 3 & 4 were an essential function of the position and (2) Tasks 1 & 2 were performed at a frequency exceeding Plaintiff's doctor's restrictions. Defendant argues the opposite, asserting that the Court properly granted summary judgment because Plaintiff had the burden of proving that she could perform the essential functions of the position and failed to provide any evidence that (1) Tasks 3 & 4 were not part of the essential functions of the handler position, and (2) that the frequency with which a handler had to perform Tasks 1 & 2 fell within her doctor's limits.

Before going any further, the Court must determine who has the burden as to these questions. "[Courts] presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (citing *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001)); see also *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012) (courts must "generally defer to an employer's determination of the essential functions of a job"); *Lloyd v. Swifty Transp. Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision."). That does not mean, however, that a district court may "completely abdicate [its] independent review" of a position's essential functions. *Feldman*, 692 F.3d at 755. Indeed, courts

7

should not "rubber-stamp an employer's assertions about which functions are essential," because doing so would allow employers to undermine the ADA by creating new essential functions as "post hoc rationalizations for unlawful discrimination." *Hawkins v. George F. Cram Co.*, 397 F. Supp. 2d 1006, 1020–21 (S.D. Ind. 2005) (quoted by *Jankowski v. Dean Foods Co.*, 378 F. Supp. 3d 697, 708 (N.D. Ill. 2019)). Thus, courts must "look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions * * * [but they] do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998) (citations omitted). Finally, whether a given function is essential is a question of fact. *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016). Once those essential functions have been determined, however, the plaintiff bears the burden of showing whether she can perform them. *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 484, 484 (7th Cir. 1997).

To determine whether a given function is essential, the ADA instructs that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Consistent with the statutory test, the Seventh Circuit has instructed courts to look "to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005)); see also 29 C.F.R. § 1630.2(n)(3). Courts "'consider but [are] not limited to, evidence of the employer's judgment as to which functions are essential, and the written job description in

effect before the employee interviewed for the position.'" *Feldman*, 692 F.3d at 756 (quoting *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 550 (7th Cir. 2011)).

Applying this standard, the Court concluded that Defendant had shown through "overwhelming evidence" that an essential function of the position was *frequently* lifting and moving packages, over the handler's waist and head, that may weigh up to 75 pounds. See [42, at 23]. Plaintiff contends the Court erred in that conclusion because there was no evidence regarding whether the exact frequency with which the component actions—*i.e.*, the tasks described above—within that function needed to be performed, if at all. See [45, at 2]. With regard to Tasks 3 & 4, Plaintiff appears to be correct. Defendant has not presented any evidence regarding the frequency with which packages weighing more than 30 pounds must be lifted above the waist and packages weighing more than 15 pounds must be lifted overhead by a handler. Thus, the Court cannot conclude that Tasks 3 & 4 are essential functions of the handler position, especially considering Plaintiff's argument that these requirements were created *post hoc*. See *DePaoli*, 140 F.3d at 674 (explaining that because there were no allegations of misconduct or the creation of pretextual qualifications, the Court would focus on the employee's ability to perform the essential functions of the relevant position).

However, Plaintiff has conceded that lifting packages above her waist and overhead are essential functions of the handler position. [42, at 25.] With that concession, it became her burden to prove that she could perform those essential functions within her doctor's restrictions. *Miller*, 107 F.3d at 484. Plaintiff contends that she is a qualified individual because, among other reasons, her doctor's restrictions allow her to lift and move objects overhead up to 15 pounds. See [45, at 9]. However, Plaintiff fails to note the temporal aspect of her doctor's restrictions, which states that she can lift and move objects overhead only with "limited frequency." [28-4, at 128 (Ex. 17

9

to Ex. A).] That brings the Court to the dispositive question in this case: has Plaintiff demonstrated that the handler job requires her to lift packages overhead with such infrequency that she could perform the job within her doctor's restrictions?

At summary judgment, the parties presented the Court with the following facts:

1. In the morning, handlers must unload packages from large metal containers referred to variously as AMJs, ULDs, or cans. These cans can be eight feet tall and eight feet deep and may contain packages stacked as high as 7.5 or 8 feet. In the evening, handlers must unload any packages picked up by couriers during the day from couriers' vehicles and load those packages back into the cans for transport to the airport. [42, at 9 (citing 22-3, ¶¶ 25–27).]

2. The couriers' vehicles can have up to three shelves running along the interior of each side, with the top shelf sitting approximately 4.5 feet above the floor of the vehicle. [42, at 9 (citing 22-3, ¶ 28).]

3. Plaintiff is 5 feet, 2 inches tall. [22-3, ¶ 29.]

4. Handlers must unload approximately 1,000 packages per hour in the morning, and load between 400-500 packages per hour in the evenings. [22-3, ¶ 35.]

5. Peter Brush, a senior manager for Defendant in 2005, testified that Plaintiff would have to maneuver packages above her head (1) 20–33 percent of the time when unloading trucks and (2) 20 percent or less when loading or unloading cans.[3] [28-7, at 30 (106:20–107:10).][4]

6. Plaintiff testified that as a handler (1) she "would have to be able to lift above [her] head to unload some * * * trucks" and (2) that "sometimes she would have to raise

---

[3] Plaintiff maintains that any discussion of loading trucks is inappropriate because she never loaded trucks. See, e.g., [28-1, at 9 ("Plaintiff did not load trucks")]. However, the Court infers that Plaintiff did load cans in the afternoon, as she did not object to that assertion made in Defendant's statement of material facts.

[4] Although Plaintiff makes much of the fact that that Brush gave two different percentages regarding how frequently a person of Plaintiff's height would have to reach overhead to move packages, see [45, at 8–9], he was speaking about two different tasks. Accordingly, the Court cannot conclude that the alleged "inconsistencies" in his testimony prohibit the Court from considering his testimony at summary judgment. "As the Advisory Committee Notes to Fed. R. Civ. P. 56(e) indicate, issues of credibility defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility' (emphasis added)." *Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir. 2001) (quoting Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e) and citing *Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998)). Moreover, Brush was speaking about different locations, and therefore different tasks, when he gave those different estimates, which are logically different given trucks and "cans" are different heights. See [42, at 9 (noting cans can be eight feet deep and tall and stacked with packages up to 8 feet high while the top shelf of the trucks sits 4.5 feet above the floor of the vehicle).]

[her] hands [overhead] to get packages off the stack in the ULD." [28-4, at 28–29 (102:9–21; 106:1–10)].[5]

7. One of Plaintiff's colleagues, Lauri Mroz, also testified that she would have to reach to the top shelf of trucks daily and that she would have to reach up and pull packages from over top her head when unloading cans; however, Mroz also testified that she did not need to reach up that often when unloading cans because they often spilled out when opened or she could pull out packages to knock down stacks. [28-5, at 14–15 (42:22–48:12).]

Considering these facts and drawing all reasonable inferences in Plaintiff's favor, Plaintiff did not provide sufficient evidence to raise a triable issue of fact on her ability to perform the essential functions of a handler. Unlike the frequency with which she handled packages of specific weights, the frequency with which Plaintiff had to reach overhead to move packages is a fact easily within her counsel's ability to have explored thoroughly in discovery.[6] As noted above, the only testimony she personally put forward regarding that question was (1) that she would have to reach overhead to unload "some" trucks and (2) that "sometimes" she would have to raise her hands overhead to get packages off the stack in an ULD. Likewise, Mroz testified that that she had to reach to the top shelf of trucks daily (which based on the record would require Plaintiff, who is 5'2" tall, to reach overhead) and she would have reach overhead at least some of the time when

---

[5] While Plaintiff also testified that she did "not normally" have to lift packages over her head when loading and unloading trucks, that testimony appears to have related to her initial employment with Defendant. [28-4, at 11 (34:2–36:11)]. And, in any event, this testimony was directly contradicted by her later testimony regarding her responsibilities in her second period of employment, noted above, which is the only period relevant to the instant analysis.

[6] Importantly, neither party has addressed what "limited frequency" means. Given that Plaintiff bore the burden of showing whether she could perform the essential function of lifting packages overhead, she also had the burden of explaining the meaning of "limited frequency." Since the phrase appears to be a term of art, the approximate number of times she could lift packages overhead could have been easily developed with the testimony of, or an affidavit by, her doctor. The fact that Plaintiff did not develop such evidence is representative of the general lack of factual development in this case, which has led to the necessity of determining exactly who bore the burden of developing and supplying the missing facts in this case. Without such a definition, the Court relies upon its own common sense that Plaintiff's doctor's direction to limit her overhead lifting to "limited frequency" means that Plaintiff could maneuver packages overhead "infrequently" or "rarely."

11

unloading cans.[7] Neither Plaintiff nor Defendant has pointed to any testimony regarding what percentage of the time a handler spends unloading trucks versus cans.

This testimony and the other facts placed into evidence at summary judgment does not create a triable issue on whether Plaintiff can perform the handler job within the limitations prescribed by her doctor. See *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (explaining that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Steen*, 486 F.3d at 1022 (explaining that summary judgment is the "put up or shut moment" in litigation "when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") There are simply too many missing facts for a reasonable jury to infer that Plaintiff would have to move packages overhead with "limited frequency" given the sheer number of packages a handler must process. A fact finder could not even begin to estimate the number of packages Plaintiff had to maneuver overhead, except perhaps to speculate that it must fall somewhere between "not that often" (assuming she was only unloading/loading cans) and "sometimes" (assuming she was only unloading trucks).[8] Either way, without more, no reasonable jury could conclude that that Plaintiff could perform this essential function without complete speculation. Plaintiff must come forward with more to survive summary judgment. Similarly, given the volume of packages in question, it would be impossible for a reasonable jury to conclude that a reasonable accommodation would excuse Plaintiff and shift another employee into her position once she reached her prescribed limit

---

[7] Both women's testimony largely corroborates that of Brush, who suggested that unloading cans would require overhead lifting 20 percent or less of the time on average while unloading trucks would require overhead lifting between 20–33 percent of the time on average. Neither woman's testimony puts into doubt Brush's testimony, let alone raises a genuine issue of material fact.

[8] Of course, no one has addressed the question of whether even "not that often" exceeds "limited frequency."

of lifting packages overhead in a given time period. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013) ("To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation."). Finally, as the Court suggested in its original summary judgment order, the fact that Plaintiff performed her job for three weeks without suffering a further injury or complaining does not provide any insight into whether she lifted packages above her head so infrequently that she could perform the handler essential functions, with or without accommodation, within her lifting restrictions.

For all of these reasons, Defendant is entitled to judgment as a matter of law on the issue of whether plaintiff is a "qualified individual" under the ADA. And the Court need not address Plaintiff's additional argument regarding Defendant's allegedly pretextual explanation for her termination (see *Majors*, 714 F.3d at 536), and must deny Plaintiff's motion for reconsideration.

## IV. Conclusion

For the reasons explained above, the Court denies Plaintiff's motion for reconsideration [45].

Dated: August 30, 2019

Robert M. Dow, Jr.
United States District Judge